79 N.J. Super. 574 (1963)
192 A.2d 320
PETER J. JUDGE, AREN KASLANDER, JAMES H. DRISCOLL, JULIAN SLATER, ANTHONY CUSANO, JEROME PALLITTO, VINCENT AMIANO AND JAMES CICALESE, AS TRUSTEES OF TEAMSTERS LOCAL UNION NO. 408 WELFARE FUND (AN UNINCORPORATED TRUST FUND), AND CHRISTOPHER VITZOW, KEVIN BEIRNE, AL CALAGUIER AND ANTHONY DEVINO, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS,
v.
WILLIAM A. KORTENHAUS, FRANCIS X. O'CONNOR, DANIEL YOUNG, JR., MILTON J. LISS, TED NALIKOWSKI AND HARRY SERIO, AS TRUSTEES OF THE JOINT WELFARE FUND OF EMPLOYERS AND LOCAL NO. 478, I.B. OF T. (AN UNINCORPORATED TRUST FUND), DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided June 20, 1963.
*576 Mr. Andrew F. Zazzali, attorney for plaintiffs.
Mr. John H. Yauch, attorney for defendant William A. Kortenhaus.
Mr. Thomas L. Parsonnet, attorney for defendant Milton J. Liss.
Mr. James H. McLeod, attorney for defendants Francis X. O'Connor, Daniel Young, Jr., Ted Nalikowski, Harry Serio and Local 478, International Brotherhood of Teamsters.
LABRECQUE, J.S.C.
In this action plaintiffs and defendants each seek judgment on the question of liability.
Plaintiffs are the trustees of the welfare fund of Local Union No. 408, International Brotherhood of Teamsters, and certain members of that local who are suing on behalf of themselves and all other members similarly situated. Defendants are Local Union No. 478, International Brotherhood of Teamsters, the trustees of that local's welfare fund, and representatives of the employers who participate in the fund.
The plaintiffs sue for the benefit of certain former members of Local Union No. 478 whose membership was transferred to Local Union No. 408 in 1955 but who continued to participate in the welfare fund of Local 478 until October 1, 1960, and for the benefit of certain additional members of Local 408 who likewise participated in the 478 fund until the latter *577 date. In the suit plaintiffs invoke the inherent jurisdiction of equity to supervise the management of trusts. By way of relief they seek a direction that the defendant trustees of the welfare fund of Local 478 turn over and deliver to the trustees of the welfare fund of Local 408 a portion of the welfare fund of Local 478 based upon the contributions of the members of Local 408 thereto.
On the day fixed for trial the matter was submitted on stipulation of facts and briefs, each side moving for judgment in its favor. From the stipulation it appears that the individual plaintiffs were all, at one time, members of Local Union 478 and, as such, beneficiaries of the "Joint Welfare Fund of Employers and Local No. 478, I.B. of T." This fund was established by an "Agreement and Declaration of Trust" dated February 11, 1953. The parties to the trust agreement were Local Union 478, certain employers in the trucking industry whose employees were represented by that local, and six trustees, three of whom were denominated "Employer Trustees" and three of whom were denominated "Union Trustees." The trust agreement itself was to cover payments to be made under collective bargaining agreements between the local and various employers.
On May 1, 1955, over two years after the establishment of the welfare fund, the International Brotherhood of Teamsters, parent body of the two locals involved, issued a separate charter to Local 408. Thereupon, approximately 85 out of 3,300 members of Local 478 were transferred to the new local. It was mutually agreed by Local 478, Local 408 and the employers involved, that the employers would continue to make contributions to the Local 478 welfare fund for the benefit of the members of Local 408. This came about when the trustees of the welfare fund were requested to extend its benefits to the employees who had been transferred to Local 408 and to additional members who joined that local. The trustees passed a resolution approving this request, and employers having agreements with Local 408 thereafter made the required contributions to the fund of Local 478.
*578 The welfare fund of Local 478 functioned without mishap until October 1, 1960, on which date Local 408 instituted its own welfare fund. Thereupon, some 810 out of approximately 4,500 members transferred from the Local 478 welfare fund to that of Local 408. Thereafter, employers having contracts with Local 408 ceased to make payments to the 478 fund. The trustees of the new Local 408 welfare fund requested the trustees of the Local 478 fund to turn over to their fund a pro rata share of any reserve and surplus in the 478 fund which would represent the interest of the 810 men who had transferred. The trustees of the Local 478 fund refused on the ground that under their construction of the trust agreement and of the arrangements made in 1955, the plaintiffs had no interest in the 478 fund "upon their severance from the 478 fund." The present suit followed.
In the trust agreement the purposes of the trust are set forth as:
"Section 1. The Trust and the Fund are created for the purpose of providing and maintaining through policies procured by the Trustees from duly licensed insurance carriers or other groups or agencies as may be determined by the Trustees, and accepted by the Trustees as part of the Fund, group life, hospitalization, accident and health insurance, and group benefits, as provided in the Labor Contract between the Employer and the Union, for the benefit of employees of the Employers, and if so determined by the Trustees, the dependents of such employees as defined by the Trustees. A copy of the agreement referred to in this section is annexed to and made a part hereof, and represents the contract in effect between the Union and the Employers in the Trucking Industry."
The trust agreement provided that each employer who was a party thereto would contribute to the fund $4 per week for each of his employees who was a member of the union, until the expiration of the collective bargaining agreement in effect between the employer and union. It also provided that:
"* * * The sum of $4.00 shall likewise be paid weekly by the Employer for each employee that the Employer desires to insure under the Fund who may not be members of the Union. The sum of $4.00 shall likewise be paid weekly by such members of the Union and *579 other individuals who may be permitted to participate in the Fund upon approval of the Trustees."
The method of application of the fund was prescribed as follows:
"(a) To pay or provide for the payment of all reasonable and necessary expenses of collecting the Employer Payments and administering the affairs of the Trust and Fund, including but without limitation, all expenses which may be incurred in connection with the establishment of the Trust and Fund, the employment of such administrative, legal, expert and clerical assistance, the purpose of leasing of such premises and the purchase or lease of such materials, supplies and equipment as the Trustees, in their discretion find necessary or appropriate in the performance of their duties.
(b) To pay or provide for the payment of premiums on the Policy or Policies when such premiums shall become due.
(c) To establish and accumulate as part of the Fund an adequate reserve for the purpose of continuing the Policies in full force and effect, such reserve to be determined by the Trustees."
The agreement describes the fund as:
"* * * the trust estate of the Joint Welfare Fund of Employers and Local No. 478 I.B. of T., which shall consist of all Policies together with all dividends, refunds or other sums payable to Trustees on account of such Policies, all investments made and held by the Trustees, all monies received by the Trustees as Employer Payments or as income from investments made and held by the Trustees or otherwise, and any other property received and held by the Trustees for uses, purposes and trusts set forth in this Agreement and Declaration of Trust."
Under section 2 of article V the trustees were given power:
"* * * to construe the provisions of this Agreement and Declaration of Trust and the terms used therein and any construction adopted by the Trustees in good faith shall be binding upon the Employers, the employees and the Union."
The agreement further provided that an employer's status ceased when he failed to qualify under the definition set forth in section 1 of article I of the agreement, i.e., when the employer no longer was a party to an agreement with the union *580 providing for participation in the fund. It further provided that:
"Section 2. When an Employer ceases to be an Employer as defined in Section 1 of Article I of this Agreement and Declaration of Trust the Trustees shall promptly notify the insurance carrier or carriers of the Policy or Policies under which the Employees of such Employers are insured, and the insurance for the benefit of the Employees of such Employer shall then be terminated as may be provided by such Policy or Policies."
The sections dealing with termination of the trust are as follows:
"Section 1. This trust may be terminated by an instrument in writing executed by all the Trustees when there is no longer in force an agreement between an Employer and the Union requiring Employer payments for the purposes hereinabove provided, except, however, that this Trust may be sooner terminated by (a) the vote of the Executive Board of the Union, and (b) the concurring vote of a majority of the Employers present at a special meeting of the Employers called for that purpose by the Administrator.
Section 2. In the event of the termination of this Trust as aforesaid, the Trustees in their discretion may continue to apply the Fund (a) to the purposes specified in Article II. Section 2(a); and (b) to the purposes specified in Article II, Section 2(b). Any balance or surplus which cannot be so applied may be applied by the Trustees to such other purposes as in their opinion will best effectuate the purposes thereof, or may be distributed and applied by them in such equitable proportion and manner as in their opinion will best effectuate the purposes hereof, until the entire remainder of the Fund has been disbursed."
The agreement also contained a provision that:
"Section 2. No Employee or any person claiming by or through such Employee by reason of having been named a beneficiary in a certificate or otherwise, nor any Employer, nor the Union, nor any other person, partnership or corporation shall have any right, title or interest in or to the Fund or any part thereof, except the Trustees."
Among the men who transferred to the Local 408 fund on October 1, 1960 were 50 of the 85 men who had originally been transferred from Local 478 to Local 408 on May 1, 1955. *581 When the transfer to the Local 408 fund took place, the 810 men were employed by approximately 173 employers who had collective bargaining agreements with Local 408 but who had been contributing to the welfare fund of Local 478 pursuant to the agreement referred to.
Local 408 and the employers with whom it had collective bargaining agreements instituted the new welfare fund in 1960 as a result of collective bargaining. Neither Local 478 nor the trustees of its welfare fund participated in the decision to institute the Local 408 fund, nor did they compel or request Local 408 or the employers having agreements with it to take such action. After the Local 408 fund was instituted the employers of members of Local 408 discontinued making contributions to the Local 478 welfare fund and, instead, began to make their contributions to the Local 408 fund.
The Local 478 fund had a surplus on May 1, 1955. However, from September 1, 1956 to September 1, 1960 it operated at a loss and drew upon its surplus funds in order to maintain coverage of beneficiaries, including the 810 members of Local 408 and members of Local 478. The amount of its loss was stipulated at approximately $5.20 per man per month during the years 1959 and 1960.
The parties have agreed that as the result of contributions made to the Local 478 fund from its inception to October 1, 1960 there was a reserve, surplus or balance in the fund of $8,300 as of the latter date. In addition, on August 3, 1961, three months after the expiration of the policy year, the company insuring the lives of the employees gave a credit to the Local 478 fund of $59,156.19. This credit was for a period during a portion of which the 810 members of Local 408 were covered (May 1, 1960 to October 1, 1960).
It has also been stipulated that in 17 instances between September 1, 1955 and September 31, 1960 the trustees of the Local 478 fund had been called upon to determine the status of employees whose employers had ceased to make contributions to the fund. In each such instance they determined that the employees had no further interest in the fund. Thirteen *582 of them involved cases where employers had moved from the local's jurisdiction and participated in another welfare fund.
Plaintiff's suit was originally instituted against the trustees of the Local 478 fund only. However, since, in effect, they were seeking a pro tanto termination of the fund which would result in a diminution of the interest of the beneficiaries entitled to participate therein, the complaint was amended to add, as additional parties, Local 478 and the employer trustees of the fund as representatives of the employers in interest. Cf. Day v. Grossman, 44 N.J. Super. 28 (App. Div. 1957).
Plaintiffs urge that part of the reserve accumulated in the Local 478 fund represents compensation earned by members of Local 408 and that it would be inequitable for them to be excluded from sharing this accumulated reserve. They assert that the Local 408 fund will afford them the same benefits as the old fund. They ask that the trustees of the old fund be directed to transfer their pro rata share of the reserve to the Local 408 fund.
The defendants urge that the Local 478 fund was created for the purpose of furnishing insurance coverage to members of Local 478 and others named in the agreement, and that the powers and obligations of the trustees, including the power to construe the agreement and to terminate the trust, are fully and completely set out in the agreement. They contend that the trustees correctly determined, in view of the circumstances, that the plaintiffs had no further interest in the fund; that this decision was made in good faith and must be sustained under the terms of the agreement. More particularly, they assert that the trust was not terminated, but that the members of Local 408 voluntarily ceased to participate therein upon the establishment of their own welfare fund and the withdrawal of their employers from the Local 478 fund.
No New Jersey case directly passing upon the question involved has been submitted by either side. The plaintiffs, however, rely upon Nicoletti v. Essenfeld, 11 Misc.2d 197, 171 N.Y.S.2d 373 (Sup. Ct. 1958), and Whelan v. *583 O'Rourke, 5 A.D.2d 156, 170 N.Y.S.2d 284 (App. Div. 1958).
Before passing to consideration of the cases cited, it is to be noted that plaintiffs do not seek distribution to themselves of the monies remaining in the trust fund, but merely ask that their equity in the fund be transferred to the new trust due to the asserted "altered circumstances," i.e., the creation of the 408 welfare fund. It is represented that the Local 408 fund will apply the monies sought to be transferred to the same purposes as the Local 478 fund. It goes without saying, however, that the rights of the Local 408 fund can rise no higher than those of the individual members of Local 408.
In Nicoletti ten members of a local union instituted suit against the trustees of the welfare fund of that union to enjoin the transfer of moneys constituting a portion of that fund to the welfare fund of another local to which approximately 25% of the local's members had been transferred on orders from the International Union. The transfer occurred in September 1954, but the employers of the transferred employees continued to contribute to the old welfare fund until March 1955 when, under a new collective bargaining agreement, they commenced to contribute to a welfare fund set up by the new local. There was a $600,000 reserve in the old fund when this change occurred, and the officials of both unions and both welfare funds began discussions towards preventing a forfeiture by the transferred employees of their ratable portion of the reserve. Eventually, the trustees of the old fund determined to pay over $55,000 to the new welfare fund as a fair and equitable disposition of the matter. Thereupon, suit was instituted to enjoin the transfer. The court, in upholding the transfer, sustained the decision of the trustees based on the broad power of construction and interpretation conferred upon them by the agreement. It was held that under this power the trustees could treat the action taken, i.e., the transfer to the new local, as a pro tanto termination. It found that the proposed transfer would not occasion a breach of the trust agreement and that there were no countervailing considerations *584 or conflicting policies which would justify or require the loss by the transferred employees of their equitable interest in the old fund.
The agreement in Nicoletti was similar in many respects to that sub judice. In passing upon the nature of the employees' interest in the fund, the court held:
"(1) Contributions made to a welfare fund, as well as the reserve accumulated therefrom, actually constitute a portion of the compensation of the employees on whose behalf they are made (cf. Labor-Management Relations Act of 1947, Section 302, 29 U.S.C.A. § 186; 93 Cong. Rec. 4882, 4883). Because such funds are trust funds, however, the participating employees have only an equitable interest in the reserve, as beneficiaries of the trust, and have no right to have any part of the reserve paid over to them directly. Nevertheless, that equitable interest is a substantial one; for the reserve serves as a protection against an increase in the cost of benefits and against a decline in employer contributions, and it may also be used in the discretion of the trustees to obtain greater benefits than would be possible on the basis of current contributions alone.
The Dairy Employees in the case at bar are no longer covered by the Local 202 Welfare Fund. Accordingly, if the portion of the reserve in that Fund accumulated from contributions made on their behalf cannot be transferred, they will lose the protection and advantage that they would otherwise derive from their equitable interest as beneficiaries of that reserve. On the other hand, if their ratable share of the Local 202 Welfare Fund reserve is transferred to the Local 277 Welfare Fund, their equitable interest as beneficiaries thereof will be preserved and continued." (171 N.Y.S.2d, at p. 376)
Nicoletti, however, would appear to be readily distinguishable from the present case. Basically, it involved the involuntary transfer of employees from one local union to another by reason of the mandate of the International Union. The question involved was whether the pro rata interest of the transferred employees in the reserve should be paid over. Here, however, while 85 members of Local 478 were required to transfer to Local 408 in May 1955, plaintiffs are not seeking the pro rata share of these men as of that time. What they actually seek is the pro rata share of the 810 men as of the date, over five years later, when they elected to terminate their participation in the old fund.
*585 In Whelan v. O'Rourke, supra, the International Brotherhood of Teamsters had ordered the transfer of approximately 1,000 members of Local 282 to Local 807. By the terms of the trust agreement governing the pension fund and the welfare fund of Local 282, the transfer had the affect of terminating any further accrual of benefits to the employees transferred. The employer-trustees of the Local 282 fund proposed to transfer to the Local 807 fund a sum representing employer pension contributions to the Local 282 fund on behalf of the transferred employees, plus income thereon but less expenses allocable thereto. Local 807's fund provided pension rights and benefits identical with those of the Local 282 fund, and it was stipulated that former members of Local 282 would be treated by the Local 807 fund as if they had always been members of Local 807. The matter was referred to an arbitrator with the understanding that his findings should represent the determination of the trustees. His decision in favor of the transfer was upheld by the court. There the trust agreement contained a provision giving the trustees power to construe the provisions of the agreement and declaration of trust and the terms used therein, and provided that any construction adopted by the trustees in good faith should be binding upon the union, the employees and the employers. The provision regarding termination authorized the trustees to distribute and apply any remaining surplus in such manner as would in their opinion best effectuate the purposes of the trust. It was also provided, with certain exceptions, that the trust agreement "may be amended in any respect from time to time by the trustees." In sustaining the action of the trustees, the court held that it was intended that the trustees should possess broad and flexible discretion in the administration of the fund and that, under their power to construe and interpret as well as to modify and amend the trust agreement, they could treat the shift of men from Local 282 to Local 287 as a pro tanto termination of that portion of the Local 282 fund assignable to the transferred men. The court's decision was carefully confined to the facts presented.
*586 In the case sub judice the trust agreement vested the trustees with substantially similar powers. They determined, on the basis of their construction of the trust agreement "and of the arrangements made in 1955," that the plaintiffs had no interest in the Local 478 fund upon their severance therefrom. The "arrangements" referred to consisted of the granting by the trustees of the Local 478 fund of the written request that members transferred to Local 408 and new members thereof be covered "with no rights to administration of this Fund at any time." Defendants urge that this determination by the trustees was made in good faith and is thus binding.
Professor Scott in his notable work on trusts sets forth the general rule applicable to the discretionary powers conferred upon trustees as follows:
"To the extent to which the trustee has discretion, the court will not control his exercise of it as long as he does not exceed the limits of the discretion conferred upon him. The court will not substitute its own judgment for his. Even where the trustee has discretion, however, the court will not permit him to abuse the discretion. This ordinarily means that as long as he acts not only in good faith and from proper motives, but also within the bounds of a reasonable judgment, the court will not interfere; but the court will interfere when he acts outside the bounds of a reasonable judgment. * * *" 2 Scott on Trusts (2d ed. 1956), § 187, p. 1374.
The same rule was followed in Englewood v. Allison Land Co., 45 N.J. Super. 538, 544 (App. Div. 1957), where the court noted:
"Discretions reposed in a trustee are of two main classes: those which demand of him merely that his act and motive be honest, in furtherance of the trust and not capricious; and those, denoted reasonable discretions which require not only this, but also the soundness of judgment exercised by a man of ordinary prudence. The strong tendency of the law is to construe every discretion so as to bring it within the second class, unless the construction is clearly unwarranted. * * * In the case of a reasonable discretion, the great injective arm of the court will be lent to a party where any act proposed by the trustees in the exercise of their discretion would amount to a clear departure from sound judgment. Cf. Scott, Trusts (2d ed. 1956), 1374-1395, 2742. For the authorities, see 6 N.J. Pract. 584-587 (1950)."
*587 Cf. Constanza v. Verona, 48 N.J. Super. 355, 358 (Ch. Div. 1958); Read v. Patterson, 47 N.J. Eq. 595, 596 (E. & A. 1891).
In Forrish v. Kennedy, 377 Pa. 370, 105 A.2d 67 (Sup. Ct. 1954), the rule was held applicable to the discretion granted in a trust agreement setting up a union welfare fund, the court quoting from In re Brown's Appeal, 345 Pa. 373, 379, 29 A.2d 52, 55 (Sup. Ct. 1942), to the effect that:
"While a court cannot control the discretion conferred upon a trustee it may compel him to exercise it in good faith and within the bounds of a reasonable judgment * * *."
In Forrish the trustees had been granted full authority regarding questions of eligibility. See also Thomas v. Kennedy, 387 Pa. 636, 130 A.2d 97 (Sup. Ct. 1957); Boyd v. Operating Engineers Welfare F. of E. Pa. and Del., 193 Pa. Super. 438, 165 A.2d 289 (Super. Ct. 1960); Barlow v. Roche, 161 A.2d 58, 63 (D.C. Mun. Ct. App. 1960).
In the instant case the court is satisfied that the discretion vested in the trustees by virtue of article V, section 2, of the trust agreement required that they act in good faith, from proper motives and within the bounds of a reasonable judgment. Unless abuse of this discretion has been established their decision is not to be set aside. Turnure v. Turnure, 89 N.J. Eq. 197 (E. & A. 1918); 1 Restatement, Trusts, § 187, p. 402 (2d ed. 1959). In order to determine whether the decision of the trustees was so unreasonable or arbitrary as to require the exercise of the court's inherent jurisdiction to relieve the plaintiffs therefrom, it is necessary to consider the action of the trustees in relation to the intention and purpose of the trust. This requires recourse to the language of the instrument itself. Fidelity Union Trust Co. v. Heller, 18 N.J. Super. 49 (App. Div. 1952); In re Central Home Trust Co., 61 N.J. Super. 109 (Ch. Div. 1960).
An examination of the trust agreement clearly indicates that it had its origin in collective bargaining agreements between Local 478 and several employers of members thereof. *588 Its benefits were restricted to members of the union who were employed by present and future employers having collective bargaining agreements with Local 478 which obligated them to make payments into the fund set up under the trust agreement and to: (1) other employees of employers the employer desired to insure, and (2) other persons, including members of the union, who were permitted by the trustees to participate in the fund. Title to the "fund" was vested exclusively in the trustees. They were given the contingent right to terminate the trust, (article VIII, section 1) and the right to amend all but certain stated articles of the agreement (article VII, section 2). They were given discretion to promulgate rules and regulations for the administration of the trust (article V, section 4). Employees had no right, title or interest in any part of the fund (article IX, section 2). Under the definition of the fund contained in the agreement it included any "refunds" due the trustees (article I, section 7).
From the foregoing it is clear and the court finds that the trust agreement in question was intended to confer benefits upon a fluid and changing group which comprehended such of the present and future employees of the employers having contracts with Local 478 as were employed at a given time, and such other persons as were permitted by the trustees to participate and were so employed. As a beneficiary of the trust, the interest of each member of the group was an equitable one only. Nicoletti v. Essenfeld, supra (171 N.Y.S.2d, at p. 376). Its extent did not depend upon the amount of an employee's contribution to the fund or the length of his service. Each new employee-participant became possessed of an interest in the fund which was equal to that of the oldest participant. To this extent the agreement exemplified the spirit of trade unionism as expressed in Del Veccio v. Hood, 4 N.J. Super. 254, 258 (App. Div. 1949), to that effect that:
"A union works for the benefit of the group; not the group as constituted when the charter is granted or the contract is made with the employer, or at some other particular date; but the group of those who are members at any time, an ever changing group. The *589 man who ceases to be a member, loses all title to the assets of the union and loses all benefits of membership while the member elected today comes into all the benefits and advantages that others have won in years gone by."
When his employment terminated, or when his employer ceased to qualify as an employer contributor to the fund, his interest ceased. It was this construction of the agreement which had been applied by the trustees on 17 occasions prior to October 1, 1960, when they determined that employees of employers who had ceased to participate in the fund no longer had any interest therein.
The decision of the trustees determined that the members of Local 408 had no interest in the trust fund as of October 1, 1960, the date of their severance therefrom. In the case of the involuntary transfer of 85 members of Local 478 in May 1955 it can well be argued, although the court makes no finding thereon, that it would have been inequitable, at that time, to have deprived them of their pro rata beneficial interest in the Local 478 welfare fund. Nicoletti v. Essenfeld, supra, at p. 378 of 171 N.Y.S.2d. While the trust agreement, itself, made no provision for such a contingency, equity is not without power in an appropriate case to afford such relief to the transferred employees as would prevent any unjust enrichment at their expense. Stretch v. Watson, 5 N.J. 268, 279 (1950).
The record stipulated is devoid of evidence of fraud, malice, bad faith, or arbitrariness on the part of the trustees which would call for the court's intervention. Barlow v. Roche, supra, at p. 63. On the contrary, the conclusions reached by them were consonant with the purpose of the agreement, were within the powers delegated, and were within the bounds of reasonable judgment. As pointed out supra, the decision of the plaintiffs to withdraw from the Local 478 fund was purely voluntary as far as the defendants were concerned. Even if the involuntary transfer of the 85 former members of Local 478 in May 1955 be considered as having carried over in favor of all members of Local 408 until October *590 1960, there are no countervailing factors which render inequitable the termination of their interest in the assets of the fund as of that time. On the contrary, no claim to any interest in the assets of the fund was made at the time of the transfer. Instead, leave to continue to participate in the fund was asked for and was given without time limitation. For over five years members of Local 408 enjoyed the same insurance benefits as did members of Local 478. During that period they participated in such advantages as accrued from the termination by the trustees, in the 17 instances cited supra, of the interest of other employees whose employers had ceased to participate in the fund. When they set up their own fund in 1960 they had the advantage of the experience gained over a period of five years. Additionally, for four of the five years in question, the cost of administration and of insurance furnished by the Local 478 fund exceeded the contributions received from the employers involved and they had advantage of the use by the trustees of surplus funds of the trust in maintaining coverage.
For the foregoing reasons the court finds that the trustees properly determined that the members of Local 408 had no interest in the welfare fund of Local 478 which survived their voluntary withdrawal from participation therein on October 1, 1960.