825 P.2d 451 (1991)
ALASKA STATE EMPLOYEES ASSOCIATION, and Linda Brenton, Alma Fitzgerald Seward, and Joseph S. Johnson, individually and on Behalf of all others similarly situated, Appellants,
v.
ALASKA PUBLIC EMPLOYEES ASSOCIATION and Alaska Public Employees Association Legal Trust Fund, Appellees.
No. S-3755.
Supreme Court of Alaska.
November 29, 1991.
*452 Don Clocksin, Wagstaff, Pope & Clocksin, Anchorage, for appellants.
Bradley D. Owens, Jermain, Dunnagan & Owens, P.C., Anchorage, for appellees.
Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

OPINION
MATTHEWS, Justice.

I. INTRODUCTION
Appellants, the Alaska State Employees Association ("ASEA") and three individual members of the General Government Unit of State employees ("GGU"), sued the Alaska Public Employees Association ("APEA") and the Alaska Public Employees Legal Trust Fund.[1] The trial court granted summary judgment for APEA. ASEA appeals.
The suit involves three union funds, the Business Leave Bank, the Strike Fund, and the Legal Trust Fund. The GGU members contributed the majority of the assets deposited in these funds. APEA once represented the GGU members, but now ASEA represents the GGU members. After it was elected to represent the GGU members, ASEA sued to obtain possession of pro-rated portions of the funds and for damages for alleged breaches of fiduciary duty by APEA.[2]

II. FACTS AND PROCEEDINGS
APEA was the certified bargaining representative for the GGU members between 1974 and 1988. GGU membership in 1988 consisted of approximately 8,300 employees. APEA only represented approximately 1,600 other employees in 1988.
In May 1988, the GGU members voted to decertify APEA as their bargaining representative. In that election, ASEA received 1,565 votes, Public Employees Local 71 received 1,554 votes, and APEA received 1,551 votes. ASEA won a run-off election against Public Employees Local 71, and on September 28, 1988, the State Labor Relations Agency certified ASEA as the bargaining representative for the GGU.
In addition to its general operating accounts, APEA maintained three funds *453 which are the subject of this lawsuit: the Association Business Leave Bank, the APEA Strike Fund Trust, and the APEA Legal Trust Fund.
The Leave Bank was established by Article 30, Section 4 of a 1984-1986 collective bargaining agreement between the State of Alaska and APEA on behalf of the GGU ("State/GGU Agreement"). The agreement requires new GGU members to contribute their first earned day of annual leave to the Leave Bank. The State converts these leave days into cash at the employee's rate of pay and holds the money in an account. The purpose of the Leave Bank is to compensate GGU members when they take unpaid leave from their State duties to conduct union business. GGU members could request withdrawals from the Leave Bank by submitting leave slips to APEA. However, the contract provided that only APEA's executive director or designee could request Leave Bank disbursements from the State.
APEA has refused to transfer the assets in the Leave Bank to ASEA. As of June 1989, the Leave Bank contained approximately $450,000.
ASEA also seeks damages for APEA's alleged breaches of fiduciary duties relating to the Leave Bank. Between May 1986 and March 1988, APEA withdrew approximately $360,000 from the Leave Bank. Each of these withdrawals was accompanied by a "letter of agreement" between APEA and the State. ASEA alleges that these withdrawals were improper because they were not paid to GGU members nor accompanied by a leave slip.
The second dispute concerns the APEA Strike Fund Trust. The Strike Fund is a trust created by APEA. The declaration of trust designates APEA as the trustee. The declaration of trust appears to be silent as to the purpose of the trust. An unlabeled document attached to the declaration of trust in the record states that the purpose of the Strike Fund is to help win strike issues, build support in the public, improve the image of public employees, communicate with the membership, and provide financial support for striking members.
The Strike Fund was funded and available to all members of APEA including non-GGU members. Specifically, the Strike Fund was funded by a $5 per APEA member per month fee,[3] collected by the State and transmitted to APEA for deposit in the fund. APEA has refused to transfer the GGU members' share of the Strike Fund to ASEA. As of May 1989, the Strike Fund held approximately $1.3 million in assets.
In addition, ASEA seeks damages for APEA's alleged breaches of fiduciary duty relating to the Strike Fund. ASEA alleges that APEA made improper withdrawals from the Strike Fund and did not properly invest the assets of the Strike Fund. APEA withdrew approximately $50,000 in 1987 and authorized the expenditure of approximately $250,000 in 1988 from the Strike Fund. ASEA alleges that these transactions were improper because they were not related to any strike.
As to APEA's investment duty, the declaration of trust provides that the trustee "shall exercise the judgment and care under the circumstances then prevailing which an institutional investor of ordinary prudence, discretion, and intelligence exercises in the management of investments entrusted to it... ." In November 1988, two months after the GGU members removed APEA as the GGU members' representative, APEA sold three APEA owned buildings to the Strike Fund for $215,000. APEA then leased back the buildings from the Strike Fund for $1 per building per year. ASEA alleges that these transactions involved unethical self-dealing by APEA and breached APEA's duty to invest prudently.
The third dispute concerns the Legal Trust Fund. Article 39 of the State/GGU Agreement authorized the Legal Trust Fund. Each month, the State paid into the *454 trust $25,000 plus $5.00 per represented employee in pay status. Approximately eighty-five percent of the total contributions received were made on behalf of GGU members, some $62,000 per month.
The purpose of the Legal Trust Fund is to "create and administer a legal services plan for the employees on whose behalf the contributions are made." The State ceased contributing on behalf of GGU members after the GGU members decertified APEA. The fund then removed the GGU members as beneficiaries, and increased benefits for the remaining beneficiaries. APEA has refused to transfer the GGU members' share of the Legal Trust Fund to ASEA. As of May 1989, the Legal Trust Fund contained approximately $746,000.
As noted above, ASEA sued APEA, seeking a pro-rated distribution of funds from the Leave Bank, the Strike Fund, and the Legal Trust Fund, and damages. APEA moved for summary judgment, which was orally granted by the trial court over opposition. Subsequently, a written order dismissing all claims with prejudice was entered. This appeal followed.

III. DISCUSSION

A. Procedural Issues

ASEA argues for dismissal and remand based on Civil Rule 54(b).[4] It contends that the trial court's ruling did not address all its claims and did not contain the certification required under Rule 54(b) when fewer than all claims are addressed. APEA, citing Reed v. Municipality of Anchorage, 741 P.2d 1181, 1194 (Alaska 1987), responds that we should presume that the trial court resolved all issues before it since there were "ground[s] asserted [in support of] the decision of the trial court."
ASEA notes that the trial court's oral ruling on summary judgment did not refer to ASEA's breach of fiduciary duty claims. However, both parties addressed all of ASEA's claims at oral argument on November 22, 1989, at the close of which the trial court made its ruling. Thus, we can presume that the trial court intended to grant summary judgment as to all of ASEA's claims.
Further, any ambiguity in the trial court's oral ruling is resolved by its written order granting summary judgment. The order states that
there exists no genuine issue as to any material facts pertaining to plaintiffs' claims regarding the business leave bank, the strike fund and the legal trust fund... .
IT IS HEREBY ORDERED that summary judgment is granted in favor of defendants concerning plaintiffs' claims involving the Association Business Leave Bank, the APEA Strike Fund and the APEA Legal Trust Fund.
IT IS FURTHER ORDERED that all claims asserted by plaintiffs in this action are thereby dismissed with prejudice... .
(Emphasis added.) This order clearly indicates that the trial court entered final judgment on all of ASEA's claims.
APEA contends that ASEA should have joined the State as a necessary party for claims related to the Leave Bank. While the State was a party to the agreement which created the Leave Bank, its absence below did not rise to a level such that "relief [could not] be accorded among those already parties." Civil Rule 19(a). Thus, the State is not a necessary party.

B. Competency

ASEA asks us to use our equitable power to order a pro-rated transfer of trust assets. Courts have equitable jurisdiction over trusts. Clews v. Jamieson, *455 182 U.S. 461, 479, 21 S.Ct. 845, 852, 45 L.Ed. 1183 (1901). This includes the power to create any remedy that furthers the cause of justice. As Justice Story noted:
In all situations and under all circumstances, whether new or old, the principles of equity will point the way to justice... . Where a new condition exists, and the legal remedies afforded are inadequate or none are afforded at all, the never failing capacity of equity to adapt itself to all situations will be found equal to the case, extending old principles, if necessary, ... for that purpose.
Story, 1 Story's Equity Jurisprudence, § 4 (14th ed. 1918). Specifically, courts have the equitable power to order a pro-rated transfer of trust assets to prevent unjust enrichment. E.g., Judge v. Kortenhaus, 79 N.J. Super. 574, 192 A.2d 320, 329 (1963). Thus, our courts have the authority to order the affirmative relief sought by ASEA.

C. Pro-Rated Transfer

The first issue concerns ASEA's request for a pro-rated transfer of trust assets. The trial court granted summary judgment to APEA. We reverse.
The trial court relied on Judge v. Kortenhaus, 79 N.J. Super. 574, 192 A.2d 320 (1963) and Occidental Life Insurance Company of California v. Blume, 65 Wash.2d 643, 399 P.2d 76 (1965), in granting summary judgment for APEA. Finding this case nearly analogous to those cases, the court remarked: "This was a voluntary departure of certain employees from a labor union to another labor union."
As the trial court noted, Kortenhaus and Occidental are decisions where courts have declined to order a pro-rated distribution of trust funds to a new employee organization following the voluntary withdrawal of employee beneficiaries from an existing employee organization. Both courts stressed the voluntary nature of the withdrawal. Kortenhaus, 192 A.2d at 326; Occidental, 399 P.2d at 80-81.
As the trial judge's emphasis on the voluntary nature of the GGU members' withdrawal from APEA implies, there are cases where, after an involuntary transfer from one union to another, a pro-rated remedy in favor of the transferring members has been ordered. E.g., Whelan v. O'Rourke, 5 A.D.2d 156, 170 N.Y.S.2d 284 (1958); Nicoletti v. Essenfeld, 11 Misc.2d 197, 171 N.Y.S.2d 373 (1958). In Kortenhaus and Occidental, the trustees had decided not to effect a pro-rated distribution of trust funds to the new employee organization, and in Whelan and Nicoletti, the trustees had decided to make such a transfer. Each of these cases can be read for the proposition that the decision of the trustees in such matters will be upheld absent an abuse of the trustees' discretion. Kortenhaus, 192 A.2d at 327 ("the court will interfere when [the trustee] acts outside the bounds of a reasonable judgment") (quoting 2 Scott on Trusts, § 187 at 1374 (2d ed. 1956)); Occidental, 399 P.2d at 79 ("[t]he question is whether the ... [t]rustees' determination ... constituted an abuse of discretion."); Whelan, 170 N.Y.S.2d at 287 ("the [t]rustees possess broad and flexible discretion in the administration of the [trust]."); Nicoletti, 171 N.Y.S.2d at 377-378 (the trustee's power to construe and interpret the trust provisions includes the power to transfer a pro-rated portion of the trust assets.)
In Occidental, the court made a careful analysis of the factual situation and decided that not ordering the pro-rated remedy was not inequitable on the facts of that case. Occidental, 399 P.2d at 81. Likewise, the New Jersey court in Kortenhaus recognized that pro-rated relief could be ordered in an appropriate case to prevent unjust enrichment, but that no such unjust enrichment occurred in the voluntary withdrawal case before it. Kortenhaus, 192 A.2d at 329. The court in Nicoletti, in upholding the trustees' discretion to effect a pro-rated distribution to the new employee organization, noted that there would be "gross injustice" if the remaining members of the old organization "were to be held entitled to retain the entire reserve for themselves... ." They would "in such event, reap an unintended windfall based on a transfer of membership over which *456 [the transferred employees] had no control." 171 N.Y.S.2d at 378.
A case that depends neither on the voluntary nature of an employee group's disassociation with the union nor on judicial deference to the decision of the trustees is Local 50, Bakery and Confectionery Workers Union, AFL-CIO v. Local 3, Bakery and Confectionery Workers Union, AFL-CIO, 733 F.2d 229 (2nd Cir.1984). In that case the employees voted to change bargaining representatives from Local 50 to Local 3. Local 3 claimed reserves in the Local 50 health benefits fund attributable to past payments made by the employer on the behalf of its employees. The trustees of the Local 50 fund refused to transfer these reserves. The trial court held that a pro-rated distribution should be made and this was upheld by the Second Circuit on appeal. The Second Circuit expressed concerns relating both to unjust enrichment, and to the chilling effect which not transferring the trust funds to a successor employee organization would have on representation elections. The court stated:
Before beginning an analysis of the law, it is helpful to recognize some of the equities at issue. On its face, this case deals with the rights of employees to reap the benefits of employer contributions made in lieu of wages. Viewed in this light, the problem here might be considered one of entitlement on the part of Entenmann's employees or, alternatively, unjust enrichment of those workers who retain Local 50 as their collective bargaining representative.
Yet a more fundamental problem exists  one that strikes at the very core of collective representation. Specifically, were we to hold that Local 50 may retain the contributions made by Entenmann's on behalf of its employees, we would be imposing a great disincentive for employees ever to change bargaining representatives. Faced with the devil's alternative of either forfeiting their right to a substantial sum of employer contributions or retaining a collective bargaining representative with which they are less than satisfied, employees may well choose the latter. Such a result would not only impinge on free choice in representation, but would also permit unions without penalty to them to become less attentive to their constituencies' demands. See Summers, Union Schism in Perspective, 45 VA.L.REV. 261, 279, n. 84 (1959). We see no necessity to make employees choose between two such bad bargains.
Local 50, 733 F.2d at 233.[5]
The legal context in which Local 50 was decided differs from that present in this case. Section 302(c)(5) of the Federal Labor-Management Relations Act permits payments by an employer to the representative of its employees only "with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents... ." 29 U.S.C. § 186(c)(5). Federal courts have jurisdiction to remedy "structural defects" in trust funds established pursuant to § 302(c)(5). The structural defect in the Local 50 case was the fact that there was no provision in the trust providing for a transfer of funds in case of a change to a different bargaining representative, in violation of the "sole and exclusive benefit" provision of the LMRA.
This difference does not substantially detract from the precedential value of the Local 50 case. The statutory command that employer contributions be for the sole and exclusive benefit of employees and their dependents is merely a specific example of the equitable principle against unjust enrichment which is expressed in more general terms by the state authorities which we have discussed. The equitable basis for the Local 50 decision becomes clearer when one compares the later Second Circuit case *457 of O'Hare v. General Marine Transport Corp., 740 F.2d 160 (2nd Cir.1984). There, some employees of the employer joined a different union while others did not. The Second Circuit held that a prorated transfer of union trust funds was not required, distinguishing Local 50 as a case where "all of an employer's employees have left a fund en mass, creating a great distortion in the organization and financing of the Funds." 740 F.2d at 173.
To claim that monies retained by the Funds contributed by an employer on behalf of all of its employees is not contributed "for the sole and exclusive benefit of the employees of such employer" whenever some of the employees choose to leave the union and fund would be an unfair and unrealistic construction of section 302(c)(5). This is especially true when considering pension funds, where financing is based on long-range actuarial projections and vesting requirements which assume that some employees for whom contributions are made will never be eligible for benefits... . Simply put, section 302(c)(5) does not require that when a small number of employees leave a large multi-employer unit, pension funds, by virtue of that circumstance alone, must return money contributed on their behalf to the employees or their new funds.
740 F.2d at 173-74.
We are in general agreement with the approach taken by the Second Circuit in Local 50 and, in our view, it should be applied to this case. The loss of the GGU decimated APEA's membership rolls. In 1988, APEA represented about 8,300 GGU employees and about 1,600 other employees. Not to require a pro-rated transfer of the trust funds would work an obvious unjust enrichment in favor of the remaining employees represented by APEA to the detriment of the GGU members. Such a result would plainly be inequitable.
Further, to withhold the transfer remedy in this case could, in future cases, give an undue advantage to an incumbent union in a representation election. This would interfere to some extent with employees' right to freely choose their bargaining representative which is implicit in the Public Employment Relations Act, AS 23.40. Kenai Peninsula Borough School Dist. v. Kenai Peninsula School Dist. Classified Ass'n, 590 P.2d 437, 439 (Alaska 1979).
Moreover, to stress the voluntary nature of the decertification in this case ignores the fact that the decertification of APEA as the GGU representative was accomplished by a closely divided vote. One thousand five hundred and fifty-one GGU members voted to retain APEA representation, yet when APEA was decertified, they did not retain the option to continue to be represented collectively by APEA.[6] It is unrealistic to say that those members voluntarily chose to leave APEA. For the above reasons, we conclude that the trial court erred in refusing to grant a pro-rated transfer.
APEA concedes that the Strike Fund and the Legal Trust Fund are trusts. Therefore, we require a pro-rated transfer of those funds to ASEA. APEA contends that the Leave Bank is not a trust. However, as we discuss below, we conclude that the Leave Bank is a trust. Thus, we also require a pro-rated transfer of the Leave Bank to ASEA.
APEA also contends that because the Strike Fund was funded through "dues," we should treat the Strike Fund differently than the Leave Bank and the Legal Trust Fund. The Strike Fund was funded by a $5 per member contribution that the State collected and turned over to APEA. APEA placed the money into the Strike Fund pursuant to the Strike Fund Declaration of Trust. The Strike Fund Declaration of Trust labeled these contributions as "dues" and as "funds."[7] APEA *458 contends that since part of the Strike Fund Declaration of Trust labels these contributions as "dues," they were dues and are the property of APEA. We disagree.
The source of the assets in the Strike Fund is not of controlling importance. Assuming, without deciding, that the contributions were dues and hence originally the property of APEA, APEA transferred its equitable interest in the contributions to its members when it placed the contributions in the Strike Fund. See Island Homes, Inc. v. City of Fairbanks, 421 P.2d 759, 764 (Alaska 1966). As trustee, APEA retained legal title in the Strike Fund assets solely to administer the assets faithfully for the benefit of its members. See RESTATEMENT (SECOND) OF TRUSTS § 74 comment a, § 170. As settlor, APEA lost all ownership rights.[8] Thus, APEA's ownership interest in the assets of the Strike Fund is no different than its ownership interest in any assets which it owns solely as trustee.
In arguing that the source of the Strike Fund is determinative, APEA incorrectly relies on In re PATCO, 724 F.2d 205 (D.C. Cir.1984). PATCO involved a dissolution of a trust that failed its essential purpose. Id. at 210. In PATCO, unsecured creditors of a bankrupt union sought a declaration that the union owned the assets in a strike benefits trust fund. The D.C. Circuit held that the trust was funded through union member dues. Id. at 210. Since union dues are the union's property, the court held that the union, not the union members, was the trust settlor. Id. at 209-210. The court applied the general rule that when a trust fails its essential purpose the assets in the trust revert back to the settlor. Id. (citing RESTATEMENT (SECOND) OF TRUSTS § 411 (1959)) (other citations omitted). Therefore, the court declared that the union owned the assets of the strike benefits trust fund. Id. Unlike PATCO, the Strike Fund Trust will not be dissolved in this case. Thus the dissolution remedy ordered in PATCO is not appropriate here.

D. Breach of Fiduciary Duty

Although the foregoing is sufficient to decide the prorated transfer issue raised by ASEA, we also must address ASEA's claims concerning breach of fiduciary duty. ASEA claims that APEA breached its fiduciary duty with respect to two of the three trusts, the Strike Fund and the Leave Bank. APEA suggests that these claims should be disposed of on appeal favorably to it on grounds different from the rationale used by the trial court which we have rejected in the preceding section. This is procedurally proper as a judgment may be defended on grounds not utilized by the trial court. Ransom v. Haner, 362 P.2d 282, 285 (Alaska 1961). With respect to the Strike Fund, however, the record is insufficiently developed and the parties' arguments are too general for us to make a determinative ruling. With respect to the Leave Bank, we are able to rule. We agree with APEA that no claim for damages is appropriate.
ASEA claims that the Leave Bank is a trust and that "[a]s a holder of the power of control, APEA is subject to a fiduciary duty, since the power it holds is for the benefit of GGU members." ASEA claims that APEA breached its fiduciary duties by participating in various withdrawals from the Leave Bank, namely: withdrawal of $100,000 to be transferred to the Legal Trust Fund; withdrawal of $60,000 paid to the State of Alaska; withdrawal of $150,000 to offset unexpected and unbudgeted negotiation costs of APEA; withdrawal of $14,116.75 to pay salary and benefits of a non-State employee; and withdrawal of $40,352.76 to pay salary and benefits of a non-GGU member.
*459 In response, APEA argues that the Leave Bank is not a trust. Alternatively, APEA argues that if the Leave Bank is a trust, APEA is the beneficiary of the trust and has no fiduciary duty as such. Further, APEA argues that the withdrawals from the Leave Bank were proper because all withdrawals were authorized under letters of understanding which in effect amended the agreement creating the trust.
A trust is defined in the RESTATEMENT as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." RESTATEMENT (SECOND) OF TRUSTS § 2 (1959). Comment h of section 2 describes the elements of a trust. They are:
(1) a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; (2) a beneficiary, to whom the trustee owes equitable duties to deal with the trust property for his benefit; (3) trust property, which is held by the trustee for the beneficiary.
As noted, APEA argues that the Leave Bank is not a trust. Rather, it creates either a third-party beneficiary contract between the State and APEA, or a debtor-creditor relationship between those parties. According to section 14 of the RESTATEMENT, comment a, one of the major differences between a contract for the benefit of a third party and a trust is that "[t]he beneficiary of a trust has the beneficial interest in the trust property; the beneficiary of a contract has merely a personal claim against the promisor... ." The Leave Bank does not appear to be a third-party beneficiary contract because the State has not agreed to assume personal liability to APEA or its members. The State has merely agreed to administer the fund created by the transfer of annual leave. When the fund is insufficient to meet the purposes of the Leave Bank, the State is not personally liable. Instead, it is then to grant annual leave if the employee in question has annual leave coming, or approve leave without pay at the option of the employee. State/GGU Agreement at Art. 30 § 4.3(b).
Likewise, the Leave Bank provision did not create a debtor-creditor relationship between APEA and the State. According to section 12 of the RESTATEMENT (SECOND) OF TRUSTS, comment a, the distinction between a trust and a debt is that the beneficiary of a trust has the beneficial interest in the trust property, whereas a creditor has merely a personal claim against the debtor. Here, article 30 creates no grounds for a personal claim against the State, whereas a segregated fund in which APEA or its members have a beneficial interest is created. For these reasons, we conclude that the Leave Bank is a trust.
We turn then to ASEA's second point. ASEA argues that the State is the trustee under the Leave Bank and APEA has the status of a person holding power of control and as such is subject to a fiduciary obligation to the GGU members. ASEA relies on the black letter rule expressed in section 185 of the RESTATEMENT (SECOND) OF TRUSTS:
If under the terms of the trust a person has power to control the action of the trustee in certain respects, the trustee is under a duty to act in accordance with the exercise of such power, unless the attempted exercise of the power violates the terms of the trust or is a violation of a fiduciary duty to which such person is subject in the exercise of the power.
This section itself does not impose a fiduciary duty on a person holding power of control. However, comment e provides that "[i]f the power is for the benefit of someone other than the holder of the power, the holder of the power is subject to a fiduciary duty in the exercise of the power." ASEA argues that the power of APEA to make requests for withdrawals from the bank  an exclusive power under article 30, section 4 subsection 3(a) of the State/GGU Agreement  is for the benefit of GGU members. APEA counters that this power is for the benefit of APEA, and thus no fiduciary obligation arises.
*460 We interpret the Leave Bank provisions as designed for the benefit of the APEA and of the employee members of GGU who take business leave for union purposes. Thus, we agree with ASEA that APEA was subject to a fiduciary duty in the exercise of its power to make requests for withdrawals.
We turn then to the question as to whether APEA was entitled to summary judgment on the grounds that it did not breach its fiduciary duty with respect to the Leave Bank. APEA's first argument on this point is that the Leave Bank's purpose was basically open ended. The final clause of the first sentence of subsection 3(a) provides that withdrawal requests from the bank will be for purposes "as may be determined by the Executive Director." APEA argues that clause means that Leave Bank funds may be withdrawn for any legitimate purpose at the sole discretion of the executive director. We reject this interpretation. The sentence in full reads as follows:
Withdrawal requests from the Bank will be for purposes of contract negotiations and formulation, executive meetings, general assembly, and State Administrative Council meetings, training sponsored by the Association, attendance at arbitration hearings as witnesses for the Association and other purposes as may be determined by the Executive Director.
In our view, the specific purposes listed prior to the "other purposes" clause, all of which involve employee attendance at union-related functions, give meaning to the more general clause. The principle applicable here is ejusdem generis (the general is controlled by the particular). See State v. First National Bank of Anchorage, 660 P.2d 406, 413 (Alaska 1982). Thus, the "other purposes" authorized under subsection 3(a) must bear a relationship to participation by an employee in some aspect of APEA's business.
APEA's second argument is that all withdrawals were proper because they were made pursuant to a letter of understanding with the State. APEA is arguing that each letter of understanding is, in effect, a modification of the trust, authorizing withdrawal of funds for the purposes mentioned in the letter of understanding.
This argument has merit. Article 33 of the State/GGU Agreement provides that the agreement can be changed using the device of a letter of understanding. Article 33 provides in part:
Prior to enacting any change in the terms and conditions of employment, as established by a specific provision of this Agreement, the Commissioner of Administration [of the State] shall obtain the approval of APEA in the form of a Letter of Understanding.
Trusts may be modified to the extent that the "settlor" of the trust has reserved the power of modification. RESTATEMENT (SECOND) OF TRUSTS § 331 (1959). Here it appears that the joint settlors of the trust, APEA and the State, reserved the power of modification, and that in accordance with the terms of the power of modification, modified the trust with respect to each of the withdrawals about which ASEA complains. Thus we agree with APEA that it is entitled to summary judgment on the question of whether the withdrawals from the Leave Bank amounted to a breach of APEA's trust duties with respect to the Leave Bank.
As to the Strike Fund, ASEA claims that the sale by APEA of its three office buildings to the Strike Trust Fund was a breach of duty, especially since APEA was allowed to lease back the buildings from the Strike Fund for rental of $1 per year for each building. Further, ASEA contends that the expenditure of $50,000 from the Strike Fund was for the purpose of general APEA operations, not a purpose of the Strike Fund Trust. Finally, ASEA contends that the appropriation of some $250,000 was for the purpose of conducting a public relations campaign in the decertification election, also not an allowable purpose under the Strike Fund Trust.
In response to ASEA's contentions concerning investment in the three buildings, APEA contends first, that the investment was reasonable and prudent and thus not a *461 fiduciary violation. Second, APEA argues that the question of investment of the funds in the buildings was presented to the APEA membership and approved, noting that where there is consent of all beneficiaries there can be no breach of fiduciary duty. Third, APEA argues that the failure of the investment to earn income does not constitute a violation of duty because of the potential for capital appreciation of the buildings.
In our view there are questions of fact concerning whether APEA, as trustee of the Strike Fund, breached its fiduciary duty. First, the purposes of the Strike Fund are not expressed in the declaration of trust which created it. Nor are the beneficiaries of the Strike Fund defined. Second, the declaration of trust creating the Strike Fund permits investment "in property of any kind ... irrespective of any statute, case, rule, or custom limiting the investment of trust funds." Whether this clause is effective to override the general rule that a trustee may not sell property which he owns individually to himself as trustee has not been briefed or argued. See RESTATEMENT (SECOND) TRUSTS § 206, comment c (1959). Further, apart from the conflict of interest question, there are questions of fact as to the value of the buildings and the prudence of the investment which need to be developed. We thus conclude that summary judgment in favor of APEA as to whether it was in breach of its fiduciary obligations to the Strike Fund was inappropriately granted.

IV. CONCLUSION
In conclusion, we direct the trial court to order a pro-rated transfer of each trust's assets. We affirm the trial court's grant of summary judgment to APEA with respect ASEA's breach of fiduciary duty claim concerning the Leave Bank. We reverse the trial court's grant of summary judgment to APEA with respect ASEA's breach of fiduciary duty claim concerning the Strike Fund and remand that claim for further proceedings.
The decision of the trial court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.
NOTES
[1] Although appellants consist of ASEA and three individuals, for ease of discussion we will refer only to ASEA as the appellant. Likewise, although appellees consist of APEA and the Alaska Public Employees Legal Trust Fund, we will refer only to APEA.
[2] This case does not fall under the Employee Retirement Income Security Act ("ERISA") because the collective bargaining agreements at issue qualify as "governmental plans" within the meaning of Section 3(32) of ERISA, 29 U.S.C. § 1002(32). The Labor-Management Relations Act ("LMRA") excludes states from its definition of employers. 29 U.S.C. § 152(2). Thus this case is decided under state law.
[3] The legal characterization of this $5/month fee as "dues" or "temporary special assessment" is hotly contested by the parties. The declaration of trust refers to the contributions as "dues," but ASEA argues that the fees have little in common with regular "dues."
[4] Civil Rule 54(b) provides:

When more than one claim for relief is presented . .. the court may direct the entry of a final judgment as to one or more but fewer then all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order ... shall not terminate the action as to any of the claims or parties, and the order ... is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.
(Emphasis added.)
[5] The court also noted with approval "the district court's requirement that the post-transfer position of the successor fund's members may not be better than their pre-transfer position. This stipulation should assure that bargaining representatives will not use today's holding as a tool with which to lure groups of employees from their current representatives." 733 F.2d at 238.
[6] Once ASEA was certified by the State Labor Relations Agency as the new bargaining representative for the GGU, no employee within the GGU was eligible to be a member of APEA.
[7] Paragraph one of the trust declaration provides:

1. Declaration of Trust
APEA hereby declares that it has set aside and now holds in trust those dues monies received as "strike fund" contributions... . APEA further declares that it will contribute to the Trust, when received, all future funds which it receives which are designated as "strike fund" contributions. (Emphasis added.)
[8] After a settlor has created a trust, the settlor has no rights or powers with regard to the trust unless the trust instrument provides otherwise. Bogert, The Law of Trusts & Trustees § 42, at 431 (rev.2d ed. 1984). In the present case, APEA reserved no rights in the Strike Fund other than the right to be the trustee.